## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ERIC HERRION, SR., *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 20-3470 (RDM) |
| DISTRICT OF COLUMBIA, | |
| *Defendant*. | |

### <u>MEMORANDUM OPINION</u>

Plaintiffs Eric Herrion Sr. and Lashelle Jones-Herrion, acting on behalf of their minor child, E.H., bring this action alleging that the District of Columbia ("District") violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* They first raised these allegations before a Hearing Officer, who concluded that the District violated the IDEA when District of Columbia Public Schools ("DCPS") officials held an "individualized education program" ("IEP") meeting without E.H.'s parents. The Hearing Officer also rejected Plaintiffs' claim that the school unilaterally reevaluated E.H.'s disabilities without providing them an opportunity for a corresponding "independent education evaluation" ("IEE"). Before this Court, both Plaintiffs and the District challenged portions of the Hearing Officer's decision, and each moved for summary judgment. At the request of the Court, Magistrate Judge Robin M. Merriweather issued a Report and Recommendation ("R&R"), attached here as Appendix A, which recommended that the Court deny in part and grant in part Plaintiffs' motion for summary judgment and deny in part and grant in part the District's cross-motion for summary judgment.

The parties raise only limited objections to Judge Merriweather's R&R, and the Court's review is therefore limited to a single, narrow question: whether the District's refusal to fund an

IEE constituted a substantive deprivation of a "free appropriate public education" ("FAPE") in violation of the IDEA.  Because the record before the Hearing Officer did not reach this question (and, instead, rejected Plaintiffs' argument on alternative grounds not now at issue), and because further development of the record is warranted, the Court will **ACCEPT** in part and **REJECT** in part Judge Merriweather's R&R, Dkt. 22, will **GRANT** in part and **DENY** in part Plaintiffs' motion for summary judgment, Dkt. 15, **DENY** the District's cross-motion for summary judgment, Dkt. 16, and will **REMAND** the matter for further consideration by the Hearing Officer.

## I. BACKGROUND

### A.    Statutory Background

The IDEA mandates that states receiving federal educational funding, including the District of Columbia, must establish "policies and procedures to ensure," among other things, that a "free appropriate public education" is available to children with disabilities.  20 U.S.C. § 1412(a); *see, e.g.*, *James v. District of Columbia*, 194 F. Supp. 3d 131, 138 (D.D.C. 2016). Congress enacted the IDEA to "ensure that all children with disabilities have available to them a free appropriate public education" that includes "special education and related services designed to meet their unique needs and [to] prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  To that end, the IDEA provides procedural protections for disabled students, confers a substantive right to a FAPE, and sets forth dispute resolution procedures in case a student's parents and her school disagree on the assistance that the IDEA requires the school to provide.

Children eligible for special education and services under the IDEA receive an "individualized education program," or "IEP," *id.* § 1414(d)(2)(A), by which "special education

and related services are 'tailored to the unique needs' of a particular child," *Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 121 (D.D.C. 2018) (quoting *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 994 (2017)). "Prepared by an 'IEP Team'—composed of the child's parents or guardians, the child's teacher, a representative of a local educational agency and, whenever appropriate, the child," the IEP "sets out the child's present academic and functional performance, establishes measurable academic and functional goals for the child, and states the special education and related services that will be provided for the child." *Id.* (citing 20 U.S.C. § 1414(d)(1)(A), (B)). The IEP Team must review the child's IEP at least annually and may revise it as appropriate to address the child's anticipated needs. 20 U.S.C. § 1414(d)(4)(A).

To assist in determining whether a student "is a child with a disability" and in developing "the content of the child's [IEP]," a local educational agency must conduct an "initial evaluation" using "a variety of assessment tools and strategies to gather relevant functional, development, and academic information, including information provided by the parent, that may assist in [making the relevant] determin[ations]." *Id.* § 1414(b)(2)(A). After the initial evaluation, each child must be reevaluated if the local education determines it is necessary or if the child's parents or teacher request such a reevaluation. *Id.* § 1414(a)(2)(A). The reevaluation shall take place "not more frequently than once a year, unless the parent and the local educational agency agree otherwise" and must be done "at least once every three years" unless the parents and local educational agency agree it is unnecessary. *Id.* § 1414(a)(2)(B).

The IDEA also requires state educational agencies to provide parents and their children with certain "guaranteed procedural safeguards," designed "to ensure that children with disabilities" receive the FAPE to which they are entitled. 20 U.S.C. § 1415(a). Among these

safeguards is the "opportunity . . . to obtain an independent educational evaluation''—or
"IEE"—"of the child." *Id.* § 1415(b)(1).  As the Supreme Court has explained, this provision
provides parents and their children with "an expert with the firepower to match the opposition."
*Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 61 (2005).  The regulations provide that "[a]
parent has the right to an independent educational evaluation if the parent disagrees with [the]
evaluation obtained by the public agency."  34 C.F.R. § 300.502(b)(1); *see also Weast*, 546 U.S.
at 60–61 (explaining that this provision "ensures parents access to an expert who can evaluate all
the materials that the school must make available, and who can give an independent opinion").
When a parent requests an IEE at public expense, the agency must, "without unnecessary delay,
either" ensure that the IEE is provided at public expense or "[f]ile a due process complaint to
request a hearing to show that its evaluation is appropriate."  34 C.F.R. § 300.502(b)(2).  The
agency "may ask for the parent's reason why he or she objects to the public evaluation," but it
"may not require the parent to provide an explanation and may not unreasonably delay either
providing the [IEE] at public expense or filing a due process complaint."  *Id.* § 300.502(b)(4).

 As a further safeguard, the IDEA permits the parents of a child with disabilities to file an
administrative complaint—often referred to as a "due process complaint"—alleging that the
public agency has failed to provide their child with a FAPE.  20 U.S.C. § 1415(b)(6)(B),
1415(c)(2).  "Whenever [such] a complaint has been received . . . [,] the parents . . . shall have an
opportunity for an impartial due process hearing" conducted by the state or local educational
agency.  *Id.* § 1415(f)(1)(A).  At that hearing, the parties may present evidence and elicit expert
testimony about the child's educational and functional needs.  *Id.* § 1415(h)(2).

 Generally speaking, the hearing officer's decision "shall be made on substantive grounds
based on a determination of whether the child received a free appropriate public education."  *Id.*

§ 1415(f)(3)(E)(i).  A hearing officer may also find that a child was denied a FAPE "[i]n matters alleging a procedural violation," but only "if the procedural inadequacies (I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits."  *Id.* § 1415(f)(3)(E)(ii).

Parents aggrieved by the hearing officer's decision may seek review in the appropriate federal district court, "without regard to the amount in controversy."  *Id.* § 1415(i)(2)(A).

## B.    Factual Background

This case involves E.H., a child eligible for special education and related services under the IDEA.  Dkt. 13-3 at 32–33 (A.R. 749–50 (Hearing Officer Interim Dec.)).  In the fall of 2019, E.H. was initially enrolled in the third grade at Burroughs Elementary, a public charter school; he had a disability classification of Speech or Language Impairment ("SLI").  Dkt. 9-2 at 47 (A.R. 252); Dkt. 14-2 at 115 (A.R. 1080).  His IEP, at the time, provided for classroom accommodations, Dkt. 9-2 at 58 (A.R. 263), seven hours per week of Special Education Services in "[m]athematics," "[r]eading," and "[w]ritten [e]xpression," and speech-language pathology and behavioral support services outside of the classroom, *id.* at 56 (A.R. 261).

In September 2019, after several weeks of struggling to get E.H. to attend school at Burroughs, E.H.'s parents transferred him to LaSalle-Backus Elementary ("LaSalle"), another D.C. public school.  Dkt. 14-2 at 117–119 (A.R. 1082–84).  On September 25, 2019, soon after E.H.'s transfer to LaSalle, a LaSalle social worker emailed E.H.'s parents, requesting to hold a meeting to "make sure all parties are on the same page and to ensure a smooth transition for [E.H.]" at LaSalle.  Dkt. 9-2 at 82 (A.R. 287).  The LaSalle team proposed to E.H.'s parents that

the school's "Behavior Technician [would] . . . meet [them and E.H.] at the side entrance to the

school" every day and "escort [E.H.] into the building without his parents," after which "[o]ne of

[E.H.'s] teachers c[ould] then escort him to class." *Id.* at 78 (A.R. 283). E.H.'s parents objected

to that approach in a September 30, 2019 email, explaining that they "want[ed] to be involved in

their sons' morning transitions inside the school building." Dkt. 10-1 at 1 (A.R. 288)).

Separately, the LaSalle team indicated that they would "provide comparable services based on

the . . . IEP" previously developed for E.H. "until [they were] able to review the new evaluations

that [they] received and reconvene to develop a new IEP." Dkt. 9-2 at 74 (A.R. 279).

On October 16, 2019, representatives from LaSalle met with E.H.'s parents for a

"transition meeting to deal with [E.H.'s] morning transition issues." Dkt. 14-2 at 44 (A.R. 1009).

At that meeting, E.H.'s parents requested "a full comprehensive set of assessments" for E.H., *id.*;

the LaSalle team indicated, in response, that E.H. would have to "be [at LaSalle] for 30 days first

and then they would consider whether or not further assessments were required." *Id.* At that

same "transition meeting," the LaSalle team slightly amended E.H.'s IEP, increasing his

behavior support services from one to two hours per month in the interest of "address[ing] his

emotional regulation skills in a one-on-one setting" and helping him "verbalize his feelings

[regarding his transition] in a safe and appropriate manner." Dkt. 10-1 at 7 (A.R. 294).

The next day, on October 17, 2019, LaSalle representatives invited E.H.'s parents to a

second meeting, scheduled for November 19, 2019, to "[r]eview existing data and [to] determine

if additional evaluations are needed." Dkt. 10-1 at 13 (A.R. 300). The LaSalle representatives

also indicated that the school would, at the November 19 meeting, "review [E.H.'s] annual IEP,"

Dkt. 10-1 at 29 (A.R. 316), which was due for its annual review before November 27, 2019, Dkt.

9-1 at 29 (A.R. 162 (IEP)). *See* 34 C.F.R. § 300.324(b)(1)(i) (requiring review of IEPs "not less

than annually").  After E.H.'s parents made several last-minute requests to reschedule the

meeting, Dkt. 10-1 at 24, 27–28 (A.R. 311, 314–15), a representative from the LaSalle team

informed E.H.'s parents that his "[I]EP w[ould] expire on [November 26]" and that they would,

therefore, "move forward with the meeting to Analyze Existing Data as well as to review the

annual IEP."  *Id.* at 29 (A.R. 316).  The representative sent E.H.'s parents a "draft IEP for

review" and promised that school representatives would later meet with E.H.'s parents "to

review what the team discusses."  *Id.*

At the November 25 meeting, the LaSalle IEP team met without E.H.'s parents.  The

team reviewed E.H.'s records, including education performance assessments and diagnostic

evaluations conducted in September 2019 and observations from E.H.'s enrollment at LaSalle to

date.  *Id.* at 72–76 (A.R. 359–63); Dkt. 13-3 at 36 (A.R. 753).  Based on those assessments, the

team changed E.H.'s disability classification from "Speech or Language Impaired" to Multiple

Disabilities (or "MD"), including Autism spectrum disorder ("ASD") and other health

impairments ("OHI"), Dkt. 13-3 at 36 (A.R. 753), and concluded that "no further testing was

required." Dkt. 10-1 at 77 (A.R. 364).  The team also developed a new IEP for E.H. that

included 14 hours per week of specialized instruction services, four hours per month of speech-

language pathology, and two hours per month of behavioral support services.  Dkt. 10-1 at 76

(A.R. 363); Dkt. 13-3 at 36–37 (A.R. 753–54).

On December 13, 2019, an attorney retained by E.H.'s parents (who also represents them

in this proceeding) sent LaSalle a letter requesting "a comprehensive re-evaluation to examine all

areas of possible disability for [E.H.]," including, "[a]t a minimum," seven assessments: (1) a

comprehensive neuropsychological assessment; (2) a comprehensive speech-language

assessment; (3) a comprehensive occupational therapy ("OT") assessment; (4) a functional

behavioral assessment ("FBA"), (5) a comprehensive auditory processing assessment; (6) a

"[c]omprehensive assessment to examine the issues of dyslexia and dysgraphia;" and (7) a

comprehensive assistive technology ("AT") assessment.  Dkt. 10-2 at 10 (A.R. 374).  The

administrative record before this Court does not include a response from LaSalle to that letter.

*See id.* at 27 (A.R. 391).

One month later, on January 13, 2020, the LaSalle team met with E.H.'s mother and her

attorney to "review the eligibility and annual IEP for [E.H.] from [November 25, 2019]."  Dkt.

10-2 at 17–18 (A.R. 382); Dkt. 13-3 at 37–38 (A.R. 754–55).  According to the meeting notes,

the LaSalle team provided E.H.'s mother and her attorney with copies of existing assessments for

E.H. and informed them about the modified disability designation and IEP developed at the

November 2019 meeting.  Dkt. 10-2 at 17–22 (A.R. 381–86).  The next day, counsel for E.H.'s

parents emailed LaSalle representatives requesting documentation of E.H.'s class schedule and

class sizes and a transition and "safety" plan so that E.H.—who had "only rarely attended school

for an entire day" since his transfer to LaSalle, Dkt. 13-3 at 38 (A.R. 755)—could "return to

school as soon as possible," Dkt. 10-2 at 24–25 (A.R. 388–89).  LaSalle's principal declined to

provide the requested information and observed that E.H.'s mother had already received "a

transition plan."  *Id.* at 23 (A.R. 387).  The principal further wrote that E.H.'s mother

> has also been provided information about [E.H.'s] classes and teachers.  Nothing
> has changed since he was enrolled at LaSalle-Backus.  The team has met with
> both parents and their advocates several times this school year.  I am unclear
> about what additional information you are seeking beyond what has previously
> been provided.
>
> Again, you may want to work with your client and her previous attorney to
> ensure they have given you all of the documents and information previously
> discussed.  Any further questions can be addressed at next week's meeting.

*Id.*

On January 31, 2020, counsel for E.H.'s parents followed up with a formal letter to LaSalle, objecting to what she characterized as "a unilateral re-evaluation" of E.H. at the November 25, 2019 IEP meeting. *Id.* at 27 (A.R. 391). The letter stated that E.H.'s parents "disagree[d] with [the DCPS's] unilateral re-evaluation," which was conducted "without including the parent[s] and without conducting any assessments." *Id.* The letter requested that the DCPS fund an IEE for E.H. "in all areas of suspected disability," including, but not limited, to the seven assessments enumerated in their December 2019 request for reevaluation. *Id.* at 27–28 (A.R. 391–92). An attorney for the DCPS declined that request on February 4, 2020, asserting that the DCPS had not "completed any evaluations of [E.H.] that [his] parent[s] [are] disagreeing with" and offering instead to "convene an [Analyze Existing Data or] AED meeting to discuss the areas of concern and determine what if any testing is necessary." *Id.* at 31 (A.R. 395).

Rather than accept that offer, E.H.'s parents filed an administrative due process complaint against the DCPS on February 11, 2020. Dkt. 10-2 at 41–46 (A.R. 405–10). The complaint averred that LaSalle's refusal to fund an IEE and its failure to include E.H.'s parents in the November 25, 2019 meeting deprived E.H. of a FAPE. *Id.* at 45 (A.R. 409). E.H.'s parents requested, among other relief, that the Hearing Officer "[o]rder [the] D.C. Public Schools to immediately fund an Independent Educational Evaluation[,] which shall include assessments in all areas of suspected disability" and "[o]rder [the] D.C. Public Schools, within 10 days of the receipt of the reports from the [IEE] to convene a[] [Multidisciplinary Team or] MDT meeting to review the reports from the assessments . . . and determine the Student's eligibility for special education services." *Id.* at 45–46 (A.R. 409–10).

Following a preliminary dispute resolution session on March 2, 2020, the DCPS revised E.H.'s IEP to increase his service hours and to change his educational setting to a nonpublic school. Dkt. 13-3 at 39 (A.R. 756); *see* Dkt. 10-3 a 11 (A.R. 461). E.H.'s mother attended this meeting, Dkt. 10-3 at 13 (A.R. 463), and agreed to the revised IEP, Dkt. 14-2 at 139 (A.R. 1104), which recommended 27 hours per week of specialized instruction "outside of the general education setting" and doubled his speech-language pathology services to four hours per month. Dkt. 10-3 at 28 (A.R. 478); *see also id.* at 33 (A.R. 483) (indicating that "Parent agrees with the team decision"). E.H.'s mother later testified that she agreed to the March 2020 IEP "change [of] placement so that [E.H.] could attend a non-public day school," Dkt. 14-2 at 139 (A.R. 1106), although the implementation of that placement change was stalled by COVID-19-related school closures, *see id.* at 140 (A.R. 1105) (explaining that E.H. could not "identify a new school that [his mother could not] visit").

In March 2020, the DCPS also issued funding authorization for the parents to obtain assessments for E.H. in six of the seven areas that E.H.'s parents had requested, *see* Dkt. 13-3 at 38 (A.R. 755): neuropsychological, speech-language, functional-behavior, auditory-processing, occupational-therapy, and assistive-technology assessments, *see* Dkt. 13-3 at 39–40 (A.R. 756–57). Of those tests, the speech-language, occupational-therapy, and assistive-technology assessments were administered in November 2020, and are attached to Defendants' summary judgment briefing. *See* Dkt. 16-1 at 1 (speech-language evaluation); Dkt 16-2 at 1 (OT evaluation); Dkt 16-3 at 1 (AT evaluation). According to E.H.'s parents, the results from the neuropsychological assessment and the functional-behavior assessment were delayed due to COVID-19 and were thus unavailable until early 2022. *See* Dkt. 25-1 at 5. Neither the parties nor the administrative record addresses the auditory-processing assessment.

The Hearing Officer held an administrative due process hearing on July 1 and 2, 2020, at which he heard testimony from E.H.'s parents and a psychologist employed by the DCPS, and also heard from counsel for E.H.'s parents.  Dkt. 13-3 at 30–31 (A.R. 747–48).  The Hearing Officer issued his interim decision on July 7, 2020.  Dkt. 13-3 at 29 (A.R. 746).  He concluded that LaSalle's "unilateral decision at the November 25, 2019 IEP meeting to change [E.H.'s] disability classification from SLI to MD, with no further testing" did not constitute a special education "evaluation" within the meaning of 34 C.F.R. § 300.502(b), *id.* at 44 (A.R. 761), and that the DCSP's refusal to the request for an IEE thus did not violate the IDEA, *id.* at 45 (A.R. 762).  He concluded, however, that the DCPS's decision to hold the IEP team meeting on November 25, 2019 without E.H.'s parents constituted a procedural violation of the IDEA, *id.* at 47 (A.R. 764), that "significantly impeded the parents' opportunity to participate in the IEP decision making process" and thus resulted in denial of a FAPE between November 25, 2019 and March 2, 2020—the date of E.H.'s IEP modification, *id.* at 48 (A.R. 765).

On this basis, the Hearing Officer determined that E.H. was entitled to a compensatory education award for the FAPE denial period and asked for "a supplemental fact-based written compensatory education proposal" from the parties.  *Id.* at 52 (A.R. 769).  E.H.'s parents responded that they could not submit a compensatory education proposal without updated educational assessments, Dkt. 13-4 at 58–59 (A.R. 840–41), while the District submitted a proposal developed by school psychologist Dr. Shantrell Huffman, *id.* at 62–67 (A.R. 844–49).  In his final decision issued on September 4, 2020, the Hearing Officer adopted the District's proposal, over the objection E.H.'s parents, Dkt. 8-1 at 11–12 (A.R. 11–12), and he ordered that E.H. receive 60 hours of individualized academic tutoring and eight hours of direct Applied

Behavior Analysis ("ABA") therapy services as compensatory education for the FAPE denial, *id.* at 12 (A.R. 12).

## C.   Procedural History

Plaintiffs filed this suit on E.H.'s behalf on November 29, 2020, alleging that the DCPS denied E.H. a FAPE in violation of the IDEA.  Dkt. 1 (Compl.).  The complaint contends, specifically, that the Hearing Officer erred in finding that E.H. and his parents were not entitled to an IEE at public expense, *id.* at 5 (Compl. ¶¶ 27–28), and in miscalculating the compensatory education due to E.H. between November 25, 2019 and March 2, 2020, *id.* (Compl. ¶¶ 29–30). Plaintiffs ask this Court to order that the DCPS "immediately fund a comprehensive [IEE]" and "remand to the Hearing Officer the issue of appropriate compensatory education relief."  *Id.* at 6 (Compl. ¶ 31).

The Court referred the case to Magistrate Judge Robin M. Meriweather for an R&R.  *See* Min. Order (Jan. 28, 2021).  On February 15, 2022, Judge Meriweather issued her R&R, concluding that the November 25 meeting involved an "evaluation" triggering E.H. and his parents' procedural right to an IEE, Dkt. 22 at 14, but that the "District's refusal to fund an IEE was a procedural defect that did not result in a denial of FAPE," *id.* at 18–19.  Judge Merriweather also concluded that "[t]he Hearing Officer's compensatory education award [was] not individually tailored" to E.H.'s circumstances, *id.* at 24, and thus recommended that "th[e] matter be remanded for further proceedings before Hearing Officer Vaden, with the instruction that a new compensatory education award crafted for E.H. must be based on data specific to E.H.," *id.* at 28.  Although the District asks this Court to adopt Judge Merriweather's R&R in full, Dkt. 26, Plaintiffs object to Judge Merriweather's conclusion that the DCPS's refusal to fund an IEE did not deny E.H. a FAPE, Dkt. 25.  Plaintiffs do not otherwise object to the R&R.

## II.  LEGAL STANDARD

Under Rule 72(b) of the Federal Rules of Civil Procedure, once a magistrate judge issues a report and recommendation on a dispositive motion, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).  The Court reviews "only those issues that the parties have raised in their objections."  *Taylor v. District of Columbia*, 205 F. Supp. 3d 75, 79 (D.D.C. 2016) (quoting *Aikens v. Shalala*, 956 F. Supp. 14, 19 (D.D.C. 1997)).  Those objections cannot "present new initiatives" that were not put before the magistrate judge.  *Id.* (citation omitted).  After reviewing the magistrate judge's recommendations and timely objections to it, the district judge "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  Fed. R. Civ. P. 72(b)(3).  Because neither party objects to the portion of Judge Merriweather's report recommending a remand to the Hearing Officer on the compensatory education award, Dkt. 25 at 2 n.1; Dkt. 26 at 1, the Court will limit its discussion to the DCPS's refusal to fund Plaintiffs' requested IEE.

The R&R addresses the parties' competing motions for summary judgment.  A party is usually entitled to summary judgment under Federal Rule of Civil Procedure 56 if she can "show[] that there is no genuine dispute as to any material fact and [that she] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The summary judgment standard in an IDEA case, however, differs from the usual Rule 56 standard.  Under the IDEA, the Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  The Court "must give 'due weight' to the hearing officer's determinations."  *Z.B. v. District of Columbia*,

13

888 F.3d 515, 523 (D.C. Cir. 2018) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)).

That deference, however, falls short of that which is "'conventional in administrative

proceedings,' especially when the decision is insufficiently supported by fact or reasoning." *Id.*

(quoting *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005)).  A

hearing decision "without reasoned and specific findings deserves little deference." *Reid*, 401

F.3d at 521 (citation omitted).

### III.  ANALYSIS

Because the District does not object to Judge Merriweather's R&R, and because

Plaintiffs lodge only a limited objection, the question before this Court is a narrow one.  As

explained above, Judge Merriweather disagreed with the Hearing Officer and concluded that the

LaSalle team's November 25 meeting constituted an "evaluation" under the IDEA, Dkt. 22 at

14–17, triggering the parent's "right to an independent educational evaluation at public expense

if the parent disagrees with [the] evaluation obtained by the public agency," 34 C.F.R.

§ 300.502(b)(1).  Neither party objects to this aspect of the R&R.  But Judge Merriweather also

concluded that the District's failure either to "[f]ile a due process complaint . . . to show that its

evaluation [was] appropriate" or to "[e]nsure that an independent educational evaluation [was]

provided at public expense," *id.* § 300.502(b)(2)(i)–(ii), constituted only a procedural defect and

did not interfere with E.H.'s right to a FAPE, Dkt. 22 at 18–20.  Plaintiffs object to that

conclusion.  Dkt. 25 at 2.

### A.

Although the issue is uncontested at this point, the Court starts by briefly noting its

agreement with the parties and with Judge Merriweather that the Hearing Officer erred in

concluding that the "November 25, 2019 IEP meeting to change [E.H.'s] disability classification

. . . with no further testing[] did not constitute a special education 'evaluation' within the

meaning of 34 C.F.R. § 300.502(b)."  Dkt. 13-3 at 44 (A.R. 761).  The regulations implementing

the IDEA provide that an "[e]valuation means [those] procedures used in accordance with [34

C.F.R. §] 300.304 through 300.311 to determine whether a child has a disability and the nature

and extent of the special education and related services that the child needs."  34 C.F.R.

§ 300.15.  Section 300.304 further specifies that, "[i]n conducting [an] evaluation, the public

agency must—"

> (1) Use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining —
>
> > (i) Whether the child is a child with a disability under § 300.8; and
> >
> > (ii) The content of the child's IEP . . . ;
>
> (2) Not use any single measure or assessment as the sole criterion for determining whether the child is a child with a disability and for determining an appropriate educational program for the child; and
>
> (3) Use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.

*Id.* § 300.304(b).  The regulations also dictate that, "as part of any reevaluation under this part,

the IEP Team . . . must . . . [r]eview existing evaluation data on the child,

including . . . (i) [e]valuations and information provided by the parents of the child; (ii) [c]urrent

classroom-based, local, or State assessments, and classroom-based observations; and (iii)

[o]bservations by teachers and related service providers."  *Id.* § 300.305(a)(1).  Only after

reviewing that "existing evaluation data" should the IEP team, with "input from the child's

parents, identify what additional data, *if any*, are needed" to assess the child's disabilities and

needs.  *Id.* § 300.305(a)(1)–(2) (emphasis added).

Taken together, these regulatory provisions establish that renewed assessments can—but need not—play a role in conducting an "evaluation" pursuant to 20 U.S.C. § 1414(a).  *See, e.g.*, *id.* § 300.304(c)(1) (including "assessments *and other evaluation materials*" under the heading of "Evaluation Procedures" (emphasis added)); *see also Z.B.*, 888 F.3d at 523 (explaining that an "evaluation does not always require a school to conduct additional testing").  If the school can determine, "on the basis of . . . review[ing] [existing evaluation data on the child]," "whether the child is a child with a disability" and, if so, ascertain the "developmental needs of the child," the school district need not gather "additional data" in the form of assessments to conduct an evaluation or "reevaluation.  20 U.S.C. § 1414(c)(1)(B); *see Hart v. District of Columbia*, 323 F. Supp. 3d 1, 3 (D.D.C. 2018) ("The IDEA does not mandate that a public agency administer additional testing as a part of a reevaluation."); *cf. Z.B.*, 888 F.3d at 523 ("When 'existing . . . evaluations and information provided by the parents' and 'observations by teachers' and other professionals provide the IEP Team with a reasonable picture of the student's skills and needs, the school may finalize an IEP without any further testing unless requested by the child's parents." (quoting 20 U.S.C. § 1414(c)(1)(A)–(B), (c)(4))).

In E.H.'s case, the LaSalle team "use[d] a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information" about E.H.  34 C.F.R. § 300.304(b)(1).  Among other things, the team reviewed "existing evaluation data on [E.H.]," including "classroom-based, local, or State assessments," *id.* § 300.305(a)(1), such as the iReady math assessment administered on September 4, 2019 and the Reading Inventory test administered on September 17, 2019, Dkt. 10-1 at 72 (A.R. 359).  The team also considered "[o]bservations by teachers and related services providers," 34 C.F.R. § 300.305(a)(1)(iii), regarding E.H.'s performance in math class, his reading skills, and his ability to "compose a

writing sample with teacher support and guidance," Dkt. 10-1 at 72–73 (A.R. 359–60); *see also id.* at 75–76 (A.R. 362–63) (describing various tests administered to E.H. on November 24, 2020, including, for example, "[five] word problems involving addition or subtraction" and "a list of 30 instructional level words with irregular spellings").  Because the LaSalle team determined (or redetermined) "the educational needs of" E.H. "[o]n the basis of [its] review" of "existing evaluation data," including "[c]urrent classroom-based, local, or State assessments, and classroom-based observations," and "[o]bservations by teachers," 34 C.F.R. § 300.305(a), the November 25 meeting constituted an "evaluation" for purposes of 34 C.F.R. § 300.502.

**B.**

If a parent "disagrees with an evaluation obtained by the public agency," the regulations provide that a "public agency must, without unnecessary delay, either . . . [f]ile a due process complaint to request a hearing to show that its evaluation is appropriate[] or . . . [e]nsure that an [IEE] is provided at public expense."  34 C.F.R. § 300.502(b)(2).  But LaSalle did neither after E.H.'s parents objected on January 31, 2020 to the school's November 25, 2019 reevaluation of E.H.  Dkt. 10-2 at 27 (A.R. 391); *see also id.* ("disagree[ing] with the [agency's] unilateral re-evaluation," which was conducted "without including the parent and without conducting any assessments").  The Court, accordingly, turns to the only point of contention between the parties: whether the District denied E.H. a FAPE when it failed to comply with the requirements of § 300.502(b)(2).  Dkt. 25-1 at 3–6.

The failure to conduct a requested or timely reevaluation is a procedural violation of the IDEA.  *See, e.g.*, *Hart*, 323 F. Supp. 3d at 3  ("The failure to conduct additional testing is considered a procedural violation under the IDEA."); *Smith v. District of Columbia*, No. 08-cv-2216, 2010 WL 4861757, at *3 (D.D.C. Nov. 30, 2010) ("A failure to timely reevaluate is at base

a procedural violation of IDEA."); *Taylor v. District of Columbia*, 770 F. Supp. 2d 105, 109 (D.D.C. 2011) (same); *see also Z.B.*, 888 F.3d at 524 (explaining that "the failure to conduct an adequate functional behavioral assessment is a procedural violation that can have substantive effects"). But "[n]ot all procedural violations constitute denials of a FAPE." *Richardson v. District of Columbia*, 273 F. Supp. 3d 94, 101 (D.D.C. 2017); *see also, e.g.*, *Smith*, 2010 WL 4861757, at *3 ("[P]rocedural violations of IDEA do not, in themselves, inexorably lead a court to find a child was denied FAPE." (alteration in original) (quoting *Shoenbach v. District of Columbia*, 309 F. Supp. 2d 71, 78 (D.D.C. 2004)); *Hart*, 323 F. Supp. 3d at 3. Rather, "an IDEA claim is viable only if [a] procedural violation[] affected the student's *substantive* rights." *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006) (emphasis in original); *see also Kruvant v. District of Columbia*, 99 F. App'x 232, 233 (D.C. Cir. 2004) (denying relief where, "although DCPS admits that it failed to satisfy its responsibility to assess [the child] for IDEA eligibility within 120 days of her parents' request, the [plaintiffs] ha[d] not shown that any harm resulted from that error"); *Z.B.*, 888 F.3d at 519 ("Failure to follow th[e] [IDEA's] procedures is actionable where it denies the child an appropriate education.").

A procedural violation of the IDEA constitutes a denial of a FAPE if, and only if, the violation "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); *see also* 34 C.F.R. § 300.513(a)(2) (explaining the grounds upon which "a hearing officer may find that a child did not receive a FAPE" in "matters alleging a procedural violation"). The plaintiff bears the burden of establishing that such a procedural defect violated the student's substantive rights. *See Smith*,

2010 WL 4861757, at *4; *Holdzclaw v. District of Columbia*, 524 F. Supp. 2d 43, 48 (D.D.C. 2007).

Because "[t]he IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child," *Endrew F.*, 137 S. Ct. at 994 (quoting *Rowley*, 458 U.S. at 181), the evaluations that inform an IEP's development "serve[] a critical purpose" in providing a FAPE to a child with disabilities, *Z.B.*, 888 F.3d at 523 (quoting *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1119 (9th Cir. 2016)).  Evaluations "allow[] the child's IEP Team to have a complete picture of the child's functional, developmental, and academic needs, which in turn allows the team to design an individualized and appropriate educational plan tailored to the needs of the individual child." *Id.* (quoting same).  It follows that the failure to conduct required evaluations, or to provide a child with disabilities and her parents with an independent evaluation at public expense, can—at least at times—"significantly compromise[] [the child's] educational opportunities and [can thereby] den[y] him a FAPE." *Hill v. District of Columbia*, 14-cv-1893, 2016 WL 4506972, at *18 (D.D.C. Aug. 26, 2016); *see also id.* at *20 (concluding that, where a delayed evaluation proposed recommendations that were, because of the delay, not considered by the IEP team, the delay "caused a deprivation of [the student's] educational benefits").

It is also possible, of course, that a delay in conducting a required IEE—or a failure to provide a child and her parents with the means of obtaining an IEE altogether—might not "affect [a student's] substantive rights," where, for example, "the student's education would not have been different had there been no delay."  *Smith*, 2010 WL 4861757, at *4 (quoting *D.R. ex rel. Robinson v. District of Columbia*, 637 F. Supp. 2d 11, 18–19 (D.D.C. 2009)).  That might be the case where "there is no evidence in the record that [the student's] placement would have changed

had DCPS completed all the reevaluations sooner" or where the record fails to establish that "the reevaluations, once conducted, led to a change in [the student's] placement or education." *Id.* Similarly, where a "[p]laintiff makes no serious attempt to show how the absence of a [requested] comprehensive psychological examination resulted in a loss of educational opportunity,"—and where "other record evidence strongly suggests that a new comprehensive psychological examination would *not* have supplied material information that [the student's] evaluators already did not possess"—a Court might quite easily conclude that a procedural error did not "abridge[] [the student's] substantive rights under the IDEA." *Hart*, 323 F. Supp. 3d at 4–5 (internal quotation marks omitted).

In her R&R, Judge Merriweather recommended that "this Court affirm Hearing Officer Vaden's determination that the District's refusal to fund an IEE for E.H. was not a denial of FAPE, notwithstanding the Hearing Officer's error as to the nature of the November 25 evaluation." Dkt. 22 at 20. Because neither party "address[ed] the effect, if any, of the IEE denial in their [summary judgment] briefs"—and because "[t]he impact of the IEE denial [was] not readily apparent to [Judge Merriweather]"—Judge Merriweather determined that Plaintiffs had failed to satisfy their burden of establishing a FAPE deprivation. *Id.* at 19–20. The District agrees: in its view, Plaintiffs have failed to carry their burden because they neither "link" any harm E.H. suffered "to . . . the three factors required under 20 U.S.C. § 1415(f)(3)(E)(ii)[] or to [the] DCPS's refusal to fund an IEE," Dkt. 26 at 4, nor "object to E.H.'s disability classification or the eligibility determination" that the parties agreed upon in the March 2020 IEP meeting, *id.* at 4–5. Plaintiffs, on the other hand, urge this Court to remand the issue to the Hearing Officer, who "never reached the issue of substantive harm" because he concluded that no procedural violation had occurred. Dkt. 25-1 at 4.

This much is true: Plaintiffs have failed, both in their summary judgment briefing and in objecting to Judge Merriweather's R&R, to lodge specific objections to the March 2020 IEP or to explain how that IEP (or E.H.'s education, more generally) would have differed had the DCPS complied with its procedural obligation to provide E.H. and his parents with an IEE, at public expense, in response to their January 2020 request. *Cf. Hart*, 323 F. Supp. 3d at 4 (concluding that plaintiffs failed to carry their burden of establishing a substantive FAPE deprivation where they "d[id] not challenge the IEP developed for [the student] . . . or later IEPs[] as deficient in any particular way"). E.H.'s mother, moreover, conceded at the due process hearing that she "agreed" with at least the placement recommendations include in the March 2020 IEP. *See* Dkt. 14-2 at 139 (A.R. 1104); *see also id.* at 275 (A.R. 1240) (testimony by LaSalle representative indicating that E.H.'s mother did not "disagree with the support that the team determined at the [March 2020 meeting] was necessary"); *id.* at 314 (A.R. 1279) (Plaintiffs' attorney framing the March 2020 IEP meeting as the one "where the school finally came to grips with the fact that this young man needed a full-time special education placement in a non-public school").

But, notwithstanding those deficiencies, the Court disagrees with Judge Merriweather's recommendation and concludes that a remand is warranted for at least three reasons. First, there is some evidence in the record that the March 2020 IEP did not mitigate all of the concerns motivating E.H.'s parents' January 2020 request for an IEE. A LaSalle representative testified at the due process hearing, for example, that E.H.'s parents had requested an IEE in part "to determine the *type of support* that [E.H.] would need . . . at a different school," *id.* at 274 (A.R. 1239) (emphasis added), suggesting that E.H.'s mother's agreement with the *placement recommendation* in the March 2020 IEP did not necessarily reflect her agreement with respect to the support that E.H. needed. *See also, e.g.*, Dkt. 25-1 at 11 (arguing that "[n]o productive

changes were made to the Student's IEP").  But because the Hearing Officer concluded in his July 7, 2020 decision that the LaSalle team's modification of E.H.'s disability classification was not an "evaluation," his decision ended there; he never addressed whether Plaintiffs had established a substantive FAPE deprivation.  Dkt. 13-3 at 44–45 (A.R. 761–62).

Where, as here, the Court reverses the Hearing Officer's threshold determination about whether there was an evaluation, the "usual rule" governing appellate review suggests that "there should be a remand for further proceedings to permit the [factfinder] to make . . . findings" that were missing "because of an erroneous view of the law."  *Pullman-Standard v. Swint*, 456 U.S. 273, 291–92 (1982); *see Z.B.*, 888 F.3d at 523 (explaining that, in IDEA appeals from a Hearing Officer's decision, a district court is "in exactly the same position" as the Court of Appeals when considering "a motion for summary judgment on the administrative record") (quoting *Reid*, 401 F.3d at 522); *Reid*, 401 F.3d at 524 (describing the IDEA's contemplation that the Hearing Officer would, in the first instance, engage in the "fact-specific exercise of discretion").  That is especially true here because both parties' briefs focused entirely on the threshold question of whether there was an "evaluation," *see* Dkt. 15-1; Dkt. 16, and because the parties have already agreed that a remand to the Hearing Officer for further factfinding on separate issues is warranted, in any event, *see* Dkt. 25 at 2 n.1; Dkt. 26 at 1.

Second, the denial of a requested IEE places the child's family in a bind that helps explain Plaintiffs' failure—before the Hearing Officer and in their objections to Judge Merriweather's R&R—to clearly articulate the substantive effects of the IEE denial.  Parents requesting an IEE are seeking an independent evaluation to determine the specific needs of their child—that is, they are seeking information that they regard as necessary to formulate an appropriate IEP—and thus, by denying their request, the local educational agency deprives them

of the very data that they need to determine whether to object to the IEP that is ultimately adopted.[1] As the D.C. Circuit has explained: "Without the requisite assessment of [the student's] needs as of the time the . . . IEP was drafted, neither the IEP team nor reviewing officer nor the district court c[an] determine what services were needed to provide an appropriate education." *Z.B.*, 888 F.3d at 524. It follows that, as with "the failure to conduct an adequate . . . assessment," the failure to provide a publicly funded IEE constitutes the type of "procedural violation that can . . . 'seriously impair[] substantive review . . . because courts cannot determine exactly what information [the assessment] would have yielded and whether that information would be consistent with the student's IEP.'" *Id.* (quoting *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012)). Consistent with this concern, Judge Lamberth has observed that the "failure to act on a request for an independent evaluation is certainly not a mere procedural inadequacy," and, "indeed, such inaction jeopardizes the whole of Congress' objectives in enacting the IDEA." *Harris v. District of Columbia*, 561 F. Supp. 2d 63, 69 (D.D.C. 2008). The Court need not adopt such a categorical view to conclude that, for the same reasons that it is difficult to review an IEP without the requested IEE, requiring parents of a child with disabilities to identify specific deficiencies in their child's IEP resulting from the denial of their request for

---

[1] The Court treats this case as an IEE denial—rather than a delayed IEE—notwithstanding the DCPS's agreement to fund several of the requested assessments in March 2020. Although, "in common parlance," an "assessment" and "evaluation" might "be synonyms," the IDEA "defines them differently." *Herrion v. District of Columbia*, 2019 WL 5086554, at *3 (D.D.C. Oct. 10, 2019). An "IEE may include multiple diagnostic assessments paid for at public expense," *Jones v. District of Columbia*, 15-cv-1505, 2017 WL 10651264, at *13 (D.D.C. Jan. 31, 2017), but those assessments are "only the building blocks to an evaluation": they are not substitutes for an independent evaluation that "considers a myriad of possible disabilities and assessments in a 'holistic' fashion, depending on the child." *Herrion*, 2019 WL 5086554, at *4 (quoting *Harris*, 561 F. Supp. 2d at 67). Thus, while the later-funded assessments might inform the Court about what kind information an IEE funded in February or March 2020 would have provided, *see infra* at 24–25, they offer an incomplete picture of the information that a complete IEE would have revealed.

an IEE—at least at times—asks too much. *See, e.g.*, *James*, 194 F. Supp. 3d at 143–44 (concluding that "[t]he failure to conduct a new comprehensive psychological evaluation of [the student] means that her IEP *might not be* sufficiently tailored to her special and evolving needs," and determining, therefore, that the absence of an evaluation was "a denial of a FAPE" (emphasis added)). And here, because Plaintiffs had yet to obtain *any* of the requested assessments at the time of the Hearing Officer's May 2020 hearings—and had obtained only three of the seven by the time of initial summary judgment briefing, *see* Dkt. 16-1; Dkt. 16-2; Dkt. 16-3; Dkt. 25-1 at 5—it is unsurprising that their hearing evidence and briefs are sparse on that point.

Finally, the few assessments that are now before this Court suggest that the Hearing Officer could plausibly, on remand, conclude that the DCPS's refusal to fund the requested IEE substantively affected E.H.'s March 2020 IEP or the services provided to E.H. in the months following March 2020.[2] The D.C. Circuit has suggested—in the context of a school district's failure to conduct its own assessments of a student—that a reviewing court must address "what [the school district] would have known" if it obtained or been presented with all relevant assessments and data. *Z.B.*, 888 F.3d at 525. In other words, if the school would have "learned anything more or different" by complying with its procedural obligations, the Court must consider the possibility that the student "may well have been entitled to a substantively different IEP from the one [the school district] offered her." *Id.* Although hearing officers and courts

---

[2] The Court recognizes that the window between the IEE request on January 31, 2020 and the IEP amendment on March 2, 2020 is short and that, even if the DCPS had quickly agreed to fund an IEE, it is possible that the evaluation would not have been completed before the March 2020 meeting. But the contents of the assessments submitted to the Court support a reasonable inference that, if the DCPS had complied with its procedural obligation to provide an IEE at public expense after Plaintiffs' January 31 request, the IEE would have prompted a legally required and renewed discussion about the services E.H. should receive.

must review the adequacy of the services provided to a student with a disability "as of the time each IEP was created, rather than with the benefit of hindsight," "evidence that post-dates the creation of an IEP is relevant to the inquiry to whatever extent it sheds light on whether the IEP was objectively reasonable at the time it was promulgated." *Id.* at 524 (internal quotation marks omitted).

Here, the District has attached to its motion for summary judgment three DCPS-funded assessments obtained in response to Plaintiffs' IEE request, all of which were conducted in November 2020: the assistive-technology Evaluation, the comprehensive occupational therapy evaluation, and the speech-language pathology evaluation. *See* Dkt. 16-1; Dkt. 16-2; Dkt. 16-3.[3] Significantly, these assessments recommend services for E.H. that were not accounted for in the March 2020 IEP. The March 2020 IEP provides, for example, that E.H. "does not require assistive technology devices and services," Dkt. 10-3 at 14 (A.R. 464), while the assistive technology assessment observes that E.H. "requires assistive technologies [('AT')] as part of his access to the educational curriculum" and recommends that the school "[f]ormally add AT considerations recommended [in the assessment] into his IEP and expand upon his current accommodations and other classroom aids and services." Dkt. 16-3 at 8. Nor does the March 2020 IEP provide for the "30 minutes per month consultative Occupational Therapy services" that the comprehensive occupational therapy evaluation recommends as of November 2020. Dkt. 16-2 at 15. Accordingly, the assessments—at least on first blush—suggest that the DCPS would have "learned [some]thing more or different" from complying with its procedural

---

[3] The Court construes the District's attachment of these documents as a request to consider the assessments as uncontested evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii). *See id.* (providing that "the court . . . shall hear additional evidence at the request of a party").

obligations and that E.H., accordingly, "may well have been entitled to a substantively different IEP from the one [the school district] offered [him]." *Z.B.*, 888 F.3d at 525.

For present purposes, the Court expresses no view on whether these later-obtained assessments, along with any other evidence, are sufficient to carry Plaintiffs' burden of establishing that E.H. was denied a FAPE.  Instead, all that the Court concludes is that there is a reasonable prospect that, on remand, the Hearing Officer will conclude that the procedural violation of the IDEA, which Judge Merriweather found and that the parties no longer dispute, led to a substantive violation.

The Court thus concludes that the Hearing Officer should be permitted, in the first instance, to review the new evidence that postdates his initial decision and to conduct the "fact-specific exercise of discretion" anticipated by the IDEA.  *Reid*, 401 F.3d at 524; *see also Taylor*, 770 F. Supp. 2d at 110 (remanding to the hearing officer to consider an independent evaluation, which was produced "more than two months after the hearing officer issued her determination" and which suggests that the student's "substantive rights under the IDEA" may, in fact, have been violated by a "failure to timely respond to plaintiff's request for an independent evaluation").  On remand, the Hearing Officer should consider, in the first instance, whether the assessments administered since his July 2020 decision do in fact suggest that E.H. was denied a FAPE as a result of the DCPS's procedural violation.  As part of that inquiry, Plaintiffs must also establish their specific objections to the March 2020 IEP and explain when, if ever, their objections to the educational services provided to E.H. were remedied.  The Hearing Officer can then consider anew the question of whether E.H. was denied a FAPE as a result of the DCPS's procedural violation and, if so, the amount of compensatory education to which E.H. is entitled.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** the District's cross-motion for summary judgment, Dkt. 16, insofar as that motion seeks affirmance of the Hearing Officer's determination that E.H. was not denied a FAPE when the DCPS declined to fund an IEE at public expense, and will **GRANT** Plaintiffs' motion for summary judgment, Dkt. 15, insofar as it seeks remand on that same issue.

Moreover, in accordance with Judge Merriweather's R&R and the parties' non-objection on this point, the Court will **GRANT** Plaintiffs' motion for summary judgment, insofar as the motion seeks reversal of the Hearing Officer's compensatory education award for the 11-week denial of a FAPE resulting from Plaintiffs' exclusion from the November 2019 IEP meeting. The Court will also **DENY** the District's cross-motion for summary judgment insofar as it seeks affirmance of that same award.

The Court will, moreover, **REMAND** this matter to the Hearing Officer (1) for determination, consistent with this Court's opinion, of whether the District's refusal to fund an IEE resulted in the denial of a FAPE (and, if so, of the proper compensatory education award); and (2) for determination, consistent with Judge Merriweather's R&R, of the proper compensatory education award for Plaintiffs' exclusion from the November 2019 IEP meeting.

A separate order will issue.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  March 27, 2023

# Appendix A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ERIC HERRION, SR., and LASHELLE JONES-HERRION, parents of the minor child E.H., | |
| Plaintiffs, | |
| v. | Case No. 20-cv-3470-RDM-RMM |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

**<u>REPORT & RECOMMENDATION</u>**

Plaintiffs Eric Herrion Sr. and Lashelle Jones-Herrion are the parents of E.H., a child with disabilities who was enrolled in the third grade in D.C. public schools during the 2019-20 school year.  Mr. Herrion and Ms. Jones-Herrion (collectively the "Parents") have accused Defendant the District of Columbia ("District") of depriving E.H. of the free appropriate public education ("FAPE") to which he is entitled under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* (the "IDEA").  The Parents ask this Court to reverse the decision of an Impartial Hearing Officer who was appointed to resolve the Parents' administrative due process complaint.  District Judge Randolph D. Moss referred the matter to the undersigned for a report and recommendation.  *See* Jan. 28, 2021 Min. Order.

Pending now are the parties' cross-motions for summary judgment, ECF Nos. 15 and 16. Having reviewed the administrative record,[1] the parties' briefs,[2] and the relevant law, the

---

[1] Citations to the administrative record, ECF Nos. 8–14 ("AR"), refer to the running pagination at the lower left margin.

[2] The relevant briefs are: Pls.' P. & A. Supp. Pls.' Mot. for Summ. J., ECF No. 15-1 ("Pl. Mem."); Def.'s Opp'n to Pls.' Mot. for Summ. J. & Cross Mot. for Summ. J., ECF No. 17 ("Def. Mem.") (duplicate filed as ECF No. 16 at *3–*21); Pls.' Reply to Def.'s Opp'n and Pls.' Opp'n to Def.'s Cross Mot. for Summ. J., ECF No. 18 ("Pl. Reply") (duplicate filed as ECF

1

undersigned recommends that this Court GRANT-IN-PART and DENY-IN-PART the Parents'

motion, GRANT-IN-PART and DENY-IN-PART the District's cross-motion, and remand this

case for further administrative proceedings, as explained below.

## BACKGROUND

Congress enacted the IDEA to ensure that children with disabilities receive a free

appropriate public education that emphasizes special education and related services tailored to

each child's unique needs, and to ensure that the rights of such children and their parents are

protected.  *See* 20 U.S.C. § 1400(d)(1)(A); *B.D. v. District of Columbia*, 817 F.3d 792, 794 (D.C.

Cir. 2016).  The statutory scheme has been described at length in other cases, including cases

involving these same litigants and counsel.  *See*, *e.g.*, *Herrion v. D.C.*, No. 18-cv-2827-RMC,

2019 WL 5086554, at *1–2 (D.D.C. Oct. 10, 2019); *Jones-Herrion v. District of Columbia*,

No. 18-cv-2828-RMC, 2016 WL 5086693, at *1–2 (D.D.C. Oct. 10, 2019).  This report and

recommendation accordingly limits discussion of the IDEA to the features of the law necessary

to understand the parties' present dispute.

## I.      Background Facts and Law

The dispute centers on E.H., a child with disabilities who is eligible for special education

and related services under the IDEA.  E.H. was enrolled in the third grade at Burroughs

Elementary, a public D.C. school, at the start of the 2019-20 academic year.  AR 1080.  At the

time, E.H. had received a disability classification of Speech or Language Impairment.  AR 162,

252.  Burroughs representatives had arranged to meet regarding E.H.'s individualized education

program, or "IEP," in early September 2019.  AR 251.  But the Parents grew concerned with the

---

19); and Def.'s Reply to Pls.' Opp'n, ECF No. 21 ("Def. Reply").  Throughout this Report and
Recommendation, page citations to documents in the record other than the AR refer to the
document's original pagination, unless the page is designated with an asterisk (e.g., *1), in which
case the reference is to the pagination assigned by PACER/ECF.

education and care E.H. was receiving at Burroughs and transferred him to LaSalle-Backus
Elementary ("LaSalle"), another D.C. public school, sometime during the week of September 23,
2019.  AR 1082–84, 251, 1008:11–15.

The same week, representatives from LaSalle invited the Parents to a "transition
meeting" for E.H.  AR 752.  At the meeting, the Parents requested "a full comprehensive set of
assessments" for E.H.  AR 752, 1009:14–20.  In the context of the IDEA, "assessments" are
evaluation tools used to measure a child's disability and determine the child's educational needs.
*See Jones v. D.C.*, No. 15-cv-1505, 2017 WL 10651264, at *13 (D.D.C. Jan. 31, 2017), *report
and recommendation adopted*, 2017 WL 10651306 (D.D.C. Feb. 22, 2017).  The LaSalle team
deferred for thirty days, noting that E.H. was new to the school and more time was needed to
determine whether a reevaluation or further assessments were required.  AR 752, 1009:14–23.

The next day, representatives from LaSalle invited E.H.'s parents to a second meeting to
take place on November 19, 2019, to "[r]eview existing data[3] and determine if additional
evaluations [were] needed."  AR 300, 303 (duplicate copy).  The LaSalle team also indicated a
desire to "review [E.H.'s] annual IEP."  AR 316.  A child's IEP outlines the child's current
academic and functional performance, the educational goals for that child for the forthcoming
year, and the special education and related services the child needs to meet those goals.  *See* 34
C.F.R. § 300.320(a).  IEPs must be reviewed "not less than annually."  *Id.* § 300.324(b)(1)(i).
E.H.'s then-current IEP had been developed on November 27, 2018, AR 162, so a review was
required no later than November 27, 2019.  *See* 34 C.F.R. § 300.324(b)(1)(i).

---

[3] A meeting at which existing data is evaluated is sometimes called an "AED meeting,"
short for "analysis of existing data."  *See, e.g.*, AR 311–16 (using the terms interchangeably);
Def. Mem. at 6 (using the same acronym).

The meeting did not take place as planned.  The day before the scheduled meeting time,[4] a representative for the Parents emailed LaSalle to request that the meeting be rescheduled.  AR 311, 1032:4–9.  LaSalle proposed November 25, 2019—the day before the school thought E.H.'s then-current IEP would "expire."  AR 313–14, 318.  E.H.'s mother was not available that day and requested a later meeting date.  AR 315–16.

The Parents' participation at this meeting was important.  The IDEA requires that schools "take steps to ensure that one or both parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate."  34 C.F.R. § 300.322(a).  Parents' participation is essential for ensuring that their child's IEP reflects the "concerns of the parents for enhancing the education of their child."  *Id.* § 300.324(a)(1)(i).  For that reason, a school may conduct an IEP meeting without a parent only if the school is "unable to convince the parents that they should attend."  *Id.* § 300.322(d).  The LaSalle team nevertheless decided to hold the meeting without E.H.'s parents, promising that school representatives would "reconvene" with the Parents later "to review what the team discusses."  AR 318, 1031:3–6.

This case turns in large part on the legal significance of that November 25, 2019 meeting held without the Parents (the "November 25 Meeting").  Meeting notes indicate that E.H.'s IEP team at LaSalle convened "to review eligibility and to develop the IEP."  AR 359.  In the process, team members reviewed existing data in E.H.'s records, including several educational performance assessments and two diagnostic evaluations of E.H. performed in April 2018 and December 2018/January 2019, both of which concluded E.H. "met diagnostic criteria for Autism Spectrum Disorder."  AR 359–63.  The LaSalle IEP team then decided that "no further testing

---

[4] The Impartial Hearing Officer incorrectly found that the Parents sent this rescheduling request "[t]he morning of the scheduled meeting."  AR 753.

[was] required" and changed E.H.'s disability classification from Speech or Language Impaired to "MD (ASD and OHI)"—multiple disabilities, autism spectrum disorder and other health impairment(s). AR 364. The team also developed a new IEP for E.H., increasing the amount of specialized instruction E.H. would receive to fourteen hours per week and providing for four hours per month of speech-language pathology and two hours per month behavioral support services. AR 363, 341–57, 753–54.

True to their word, representatives of the LaSalle team then scheduled a meeting with the Parents to "review the eligibility and annual IEP for [E.H.] from 11.25.19." AR 382; 754–55. The group met on January 13, 2020 (the "January 13 Meeting"), at which time E.H.'s mother and the Parents' attorney were given copies of existing assessments for E.H. and informed of the school's modifications to E.H.'s disability designation and IEP. AR 381–86; 1227:21–24. The meeting does not seem to have gone well. The following day, the Parents' attorney emailed LaSalle representatives requesting information, including E.H.'s class schedule and class sizes, transition plan, and a "safety plan," so that E.H. "can return to school as soon as possible." AR 388–89. An attorney for the District of Columbia Public Schools ("DCPS") responded that the requested information had previously been provided to the Parents and the Parents' former counsel and declined to provide it again. AR 387–88.

The parent-school relationship deteriorated further two weeks later, when counsel for the Parents sent LaSalle a formal letter that, among other things, accused LaSalle of conducting a "unilateral re-evaluation" of E.H. at the November 25 Meeting. AR 391. The letter indicated that the Parents "disagree[d] with the unilateral re-evaluation" and demanded that DCPS "fund an independent re-evaluation of [E.H.] in all areas of suspected disability." *Id*. An independent educational evaluation, or "IEE," is a procedural safeguard meant to ensure parents are "not left

to challenge" a school's evaluation of their child "without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition." *Schaffer v. Weast*, 546 U.S. 49, 61 (2005). Parents are entitled to an IEE at public expense if they "disagree" with an "evaluation" conducted by the school, unless the school demonstrates that its evaluation was "appropriate." 34 C.F.R. § 300.502(b); *see also T.P. ex rel. T.P. v. Bryan Cty. Sch. Dist.*, 792 F.3d 1284, 1293 (11th Cir. 2015) (explaining the purpose of an IEE).

Staff at LaSalle were "shocked" by the Parents' demand. AR 1229:15. The school's LEA representative later testified that she felt the school had not yet "had the opportunity . . . to collect appropriate data . . . and to do evaluations" for E.H. AR 1229:23–25. School representatives thus felt there was no extant evaluation with which the Parents could disagree. *See id.* The Parents had voiced no disagreement or request for assessments at the January 13 Meeting, for example. AR 398. So rather than agree to fund an IEE, LaSalle offered to "convene an AED meeting to discuss the areas of concern and determine what if any testing is necessary." AR 395.

The Parents were not interested. Rather than respond to the AED meeting invitation, *see* AR 403, on February 11, 2020, they filed an administrative due process complaint seeking to compel a publicly funded IEE and alleging that the school's failure to include the Parents at the November 25 Meeting resulted in a denial of FAPE for E.H. AR 406–13. The complaint triggered an administrative due process proceeding under 20 U.S.C. § 1415(f), including a preliminary "resolution session" pursuant to § 1415(f)(1)(B).

## II.    Administrative Proceedings

The resolution session was held March 2, 2020 (the "March 2 Resolution Session"). AR 451. Representatives of LaSalle and DCPS, E.H.'s mother, and the Parents' counsel were present. AR 451, 462. The parties' disagreement over the IEE demand was not resolved. *See*

AR 451, 491–92.  But the parties were able to partially address the Parents' concern about their

non-participation in the November 25 Meeting by holding a new IEP meeting for E.H.  *See* AR

451–57, 460–61.  With added input from E.H.'s mother and the Parents' counsel, E.H.'s IEP was

updated to reflect that E.H. required full-time placement in a nonpublic setting and twenty-seven

hours per week of specialized instruction.[5]  AR 477–78, 756 ¶ 25.  A few days later, DCPS also

agreed to fund independent neuropsychological, speech-language, occupational therapy, auditory

processing, assistive technology, and independent functional behavior assessments for E.H.  AR

481–82, 496–97.

     With some aspects of their dispute still unresolved, the parties then proceeded to the due

process hearing phase as contemplated by 20 U.S.C. § 1415(f)(1)(A) and (f)(1)(B)(ii).  At this

hearing, the parties presented evidence to an impartial hearing officer—in this case, Peter Vaden

("Hearing Officer Vaden").  AR 417–19.  Hearing Officer Vaden was required to determine

based on the evidence "whether the child received a [FAPE]" or, in the case of an alleged

procedural violation of the IDEA, whether the procedural deficiency "(I) impeded the child's

right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the

decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused

a deprivation of educational benefits."  *Id.* § 1415(f)(3)(E).  If Hearing Officer Vaden determined

that that the school had denied E.H. a FAPE, he was to order an appropriate remedy, including

potentially compensatory education.  *See B.D.*, 817 F.3d at 798.  Compensatory education is an

equitable remedy that "aims to put a student . . . in the position he would be in absent the FAPE

denial."  *B.D.*, 817 F.3d at 798.

---

     [5] The IEP developed March 2, 2020 also reflected that E.H. required four hours per
month of speech-language pathology and two hours per month behavioral support services.  AR
477–78.  These numbers were unchanged from the November 25, 2019 IEP.  *See* AR 354–55.

Hearing Officer Vaden held the administrative due process hearing on July 1 and 2, 2020. AR 746.  He reviewed hundreds of pages of exhibits and extensive testimony from the Parents; the Parents' expert witness on compensatory education plans; a former advocate for the child; the Principal of LaSalle; one of the school's social workers; and the school's LEA Representative Designee.  AR 748, 989, 1169.  Hearing Officer Vaden began by rejecting the District's theory that the Parents' complaint was moot because the District had agreed to fund several independent assessments of E.H. following the March 2 Resolution Session.  AR 747; *see also* AR 631–35. He then concluded that LaSalle's "unilateral decision at the November 25, 2019 IEP Meeting to change [E.H.'s] disability classification from SLI to MD, with no further testing, did not constitute a special education 'evaluation' within the meaning of 34 C.F.R. § 300.502(b)."  AR 761–62.  He reasoned that the school's refusal to fund the IEE demanded by the Parents was therefore not a denial of FAPE.  AR 761–62.  The hearing officer's decision was based on testimony from a LaSalle witness; a position taken by the Parents in their January 31, 2020 demand letter to DCPS; and the reasoning of *F.C. v. Montgomery County Public Schools*, an unpublished decision from the District of Maryland discussed in more detail below.  AR 758–62.

Hearing Officer Vaden also held that the school's decision to conduct the November 25 Meeting without the Parents was a procedural violation of the IDEA that resulted in a denial of FAPE between November 25, 2019, and March 2, 2020—the date on which E.H.'s IEP was modified to reflect input from E.H.'s mother and the Parents' counsel, resulting in the determination that E.H. required full-time placement in a nonpublic school (the "FAPE denial period").  AR 762–67.  Hearing Officer Vaden reasoned that E.H. was entitled to a compensatory education award for the FAPE denial period.  AR 767.  But with insufficient evidence in the record to craft an appropriate award, Hearing Officer Vaden ordered the Parents to submit "a

supplemental fact-based written compensatory education proposal" within twenty days of his

initial decision.  AR 769.  He "invited" but did not require the District to submit a proposal of its

own.  *Id*.; *see also* AR 6.

The Parents responded by asserting that they could not submit a compensatory education

proposal without updated assessments of E.H.  AR 796–99.  The Parents pointed for support to

testimony from their compensatory education expert Dr. Paul Livelli, who had stated at the initial

due process hearing that he did not "think it's possible to develop an accurate comp. ed. plan"

based on existing data about E.H.  AR 819.  The Parents also produced an affidavit from Dr.

Livelli stating that it was his "professional/expert opinion that at this point in time it [was] not

possible to develop an appropriate compensatory education plan" because E.H.'s files lacked

"appropriate data reflecting where [E.H.] was functioning" before and after the FAPE denial.

AR 840–41.  His position, in other words, was that the limited data in E.H.'s educational records

was not sufficiently up-to-date to develop a compensatory education plan.  *Id*.

The District found no such difficulty.  On July 28, 2020, the District submitted a

compensatory education proposal developed by school psychologist Dr. Shantrell Huffman.  AR

844–49.  Dr. Huffman reasoned in the plan that E.H.'s "educational loss" over the FAPE denial

period of 11-weeks was akin to "summer loss" over a standard 12-week summer break.  AR 846.

Although the data he reviewed was "assorted," Dr. Huffman found that student achievement

scores decline on average "by one-month of school learning during the 12-week summer break."

AR 847.  Dr. Huffman therefore proposed compensating E.H. with the equivalent of one month

of educational programming, totaling sixty hours of special education programming and eight

hours of direct applied behavior analysis ("ABA") therapy.  *Id*.  Although the proposal indicated

that Dr. Huffman had reviewed E.H.'s academic records, including special education progress

reports, formal and informal academic assessments, and school attendance and behavioral reports, and had conducted interviews with E.H.'s case manager and school principal, the link between this information and the "summer loss"-based proposal was not clear from the face of the proposal.  *See* AR 844–49.

At the Parents' request, Hearing Officer Vaden called a supplemental hearing to give the Parents an opportunity to examine Dr. Huffman.  AR 3, 1310–55.  Dr. Huffman's testimony revealed additional considerations underlying his proposal: It seems that Dr. Huffman's review of E.H.'s educational records indicated to Dr. Huffman that E.H. had "average cognitive ability and . . . average academic scores" and was therefore "developing cognitively with regards to his academic performance in the same manner as someone with average cognitive ability"—in short, that E.H. was "developing average."  AR 1336:9–17.  Because E.H. had not suffered any injury that would impair his cognitive development, Dr. Huffman reasoned that he could infer E.H.'s current academic achievement levels.  AR 1336–37, 1345–46, 1351.  These achievement levels in turn led Dr. Huffman to infer that E.H. would experience summer learning losses akin to other average students, tying the summer loss literature to E.H.'s specific academic achievement levels.  *See* AR 1332.  In closing remarks, the Parents objected to Dr. Huffman's proposal on the basis that it was not based on data specific to E.H. and that Dr. Huffman had used a numerical formula to develop his proposal—a tactic the Parents asserted had been "routinely and repeatedly . . . rejected by the courts."  AR 1352.

Hearing Officer Vaden adopted the District's proposal over the Parents' objections.  AR 9–11.  He ordered that E.H. receive of sixty hours of individual academic tutoring and eight hours of direct ABA therapy as compensatory education for the FAPE denial.  AR 12.  This suit followed.

### III.     Procedural History in This Court

The Parents filed their complaint to this Court on November 29, 2020.  *See* ECF No. 1.
They allege that Hearing Officer Vaden erred in holding that the Parents were not entitled to an
IEE at public expense, *see id.* ¶¶ 27–28, and that Hearing Officer Vaden miscalculated the
compensatory education due to E.H. for the FAPE denial between November 25, 2019, and
March 2, 2020.  *See id.* ¶¶ 29–30.  They request an order reversing these alleged errors, requiring
the District to fund a comprehensive IEE and convene a meeting to adjust E.H.'s IEP in light of
the IEE, remanding the matter of compensatory education back to Hearing Officer Vaden, and
awarding them attorneys' fees and costs.  *See id.* at 6–7.  The District answered on January 27,
2021.  *See* ECF No. 6.  The parties then filed their competing motions for summary judgment.
*See* ECF Nos. 15, 16.  Those motions are now fully briefed and ripe for this Court's adjudication.

### LEGAL STANDARD

Although styled as motions for summary judgment, the cross-motions before the Court
more accurately seek review of Hearing Officer Vaden's administrative due process decision.
*See S.B. v. District of Columbia*, 783 F. Supp. 2d 44, 50 (D.D.C. 2011).  The Court must afford
the administrative decision "due weight" and consider its factual findings "prima facie correct."
*Id.* (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982) and *Roark ex rel. Roark v. District
of Columbia*, 460 F. Supp. 2d 32, 38 (D.D.C. 2006)).  This Court's review is nevertheless "less
deferential than is conventional in administrative proceedings." *B.D.*, 817 F.3d at 797 (quoting
*Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005)).  Portions of the
administrative decision focused on statutory interpretation are "pure question[s] of law that
courts review de novo." *Reid*, 401 F.3d at 521.  Compensatory education awards are similarly
afforded "little deference."  *Id.* at 525.  The party challenging the administrative determination

11

has "the burden of persuading the court that the hearing officer was wrong." *S.B.*, 783 F. Supp. 2d at 50 (quotation omitted); *see also B.D.*, 817 F.3d at 797 (same).

## DISCUSSION

The Parents raise two challenges to the Hearing Officer's determination in this matter: First, they insist that Hearing Officer Vaden wrongly concluded that the Parents were not entitled to an IEE at public expense after they disagreed with the results of the November 25 Meeting; and Second, they disagree that an appropriate compensatory education award for the District's failure to provide E.H. with a FAPE between November 25, 2019, and March 2, 2020, was sixty hours of academic tutoring and eight hours of ABA therapy. *See* Compl. ¶¶ 27–30.  The District assures this Court that the Parents' request for an IEE at public expense is moot because the District agreed at the March 2 Resolution Session to fund six independent assessments of E.H. and at least three of those assessments have already occurred. *See* Def. Mem. at 12–13.  The District also suggests the Parents waived their right to challenge the adequacy of the compensatory education award by failing to present a compensatory education plan. *See id.* at 18–19.  In the alternative, the District urges the Court to affirm both of the Hearing Officer's conclusions on their merits. *See id.* at 13–19.

## I.       The IEE Claim

The undersigned addresses the parties' IEE arguments first because a finding that the Parents were entitled to an IEE at public expense would require modification of the relief granted to the Parents, including potentially the Hearing Officer's compensatory education award.

### A.       *The IEE claim is not moot.*

Before proceeding to the merits of the parties' IEE dispute, the undersigned must address the District's mootness objection. *See D.C. v. Doe*, 611 F.3d 888, 894 (D.C. Cir. 2010) (noting that mootness is a jurisdictional issue); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101

(1998) (holding that jurisdiction must be confirmed before considering other matters).  The District's mootness argument is premised on its agreement following the March 2 Resolution Session to fund independent neuropsychological, speech language, occupational therapy, auditory processing, assistive technology, and functional behavior assessments of E.H.  *See* Def. Mem. at 11–12.  The District says these assessments constitute an IEE, so the Parents have already received the relief they seek, leaving nothing for this Court to resolve.  *See* Def. Mem. at 12–13.

The undersigned is not convinced.  Hearing Officer Vaden rejected a similar argument during the underlying administrative proceedings in light of this Court's decision in *Herrion v. District of Columbia*, No. 18-cv-2827-RMC, 2019 WL 5086554 (D.D.C. Oct. 10, 2019).  AR 634.  *Herrion* teaches that a parent's right to an independent *evaluation* cannot be cured by the school's funding of independent *assessments*.  *See* 2019 WL 5086554, at *4.  That logic applies cleanly to the parties' dispute here, undercutting the District's suggestion that its agreement to fund assessments functions as an agreement to fund an IEE.

The District attempts to distinguish *Herrion* on the basis that the District conducted an evaluation in that case but has not conducted an evaluation here.  *See* Def. Reply at 3.  Whether the District's actions at the November 25 Meeting amounted to an "evaluation" is the legal question at the heart of the parties' substantive IEE dispute, discussed more fully below.  *See* Pl. Mem. at 14–15; Def. Mem. at 13–15; Pl. Reply at 3–4; Def. Reply at 3–4.  A substantive controversy over proper construction of the law, in which relief is appropriate if the law is construed one way but not the other, does not deprive this Court of jurisdiction.  *See Steel Co.*, 523 U.S. at 89.  The undersigned accordingly believes the Parents' IEE claim is not moot, and recommends that this Court exercise jurisdiction over the claim.

13

**B.      The November 25 Meeting constituted an "evaluation" triggering the Parents' procedural right to an IEE.**

Turning to the merits of the IEE dispute, the parties disagree on whether E.H. was "evaluated" at the November 25 Meeting, at which his disability classification was changed and a new IEP developed without input from the Parents. *See, e.g.*, Pl. Mem. at 14–15; Def. Mem. at 13–15. The IDEA provides that a parent of a child with a disability has a right to an IEE at public expense if the parent "disagrees" with an "evaluation" by the public agency. 34 C.F.R. § 300.502(b)(1). The Parents insist that, by reviewing existing assessments, determining that no additional data was needed, and concluding that E.H. continued to qualify for special education services under a new disability classification, staff at LaSalle completed an "evaluation" of E.H. within the meaning of § 300.502 at the November 25 Meeting. *See* Pl. Mem. at 14–15. Hearing Officer Vaden disagreed, reasoning that the absence of "further testing" rendered the November 25 decision to reclassify E.H.'s disability something other than an "evaluation." AR 761.[6]

The District urges the Court to affirm the Hearing Officer's conclusion because, in its estimation, "reviewing educational data to determine whether a student continues to be a child with a disability is not an evaluation as contemplated by the IDEA." Def. Mem. at 15; *see also* Def. Reply at 3 (suggesting the Parents "are confusing an eligibility meeting with a reevaluation"). In support, the District expands on the logic implicit in Hearing Officer Vaden's Interim Decision: The theorem depends first on the uncontested proposition that "evaluations"

---

[6] Hearing Officer Vaden also noted that a representative for LaSalle "testified at the due process hearing that DCPS never, at any point in the 2018-2019 school year, evaluated" E.H., and that this testimony "was consistent with" a January 2020 letter from the Parents' attorney which stated that "the comprehensive re-evaluation requested by the [P]arents has not occurred." *Id*. Whether the actions of the LaSalle IEP Team at the November 25 Meeting amount to an "evaluation" is a legal determination, not a factual one, so the classification assigned to the meeting by various witnesses or in documents exchanged by the parties is not dispositive of the issue.

14

and "assessments" are distinguishable under the IDEA—assessments are the building blocks of evaluations, while evaluations are "the process during which these assessments occur." Def. Mem. at 15 (quoting *Jones-Herrion v. District of Columbia*, No. 18-cv-2828-RMC, 2019 WL 5086693, at \*3 (D.D.C. Oct. 10, 2019)). Because the school conducted no "assessments" of E.H. during or leading up to the November 25 Meeting, the District reasons that an "evaluation" could not have occurred. *See* Def. Reply at 3–4. There were no assessment building blocks from which to construct an evaluation, in other words. *See id*. The District suggests that the November 25 Meeting amounted to, at most, an "eligibility meeting" at which "a group of qualified professionals" met "to determine the educational needs of the child." *Id.* (citing 34 C.F.R. § 300.306(a)(1)).

The District's analysis is flawed. To explain why, a short walk through the IDEA's statutory language and related regulations is essential. Parents have the right to an IEE at public expense only if the school completes an "evaluation." 34 C.F.R. § 300.502(b)(1). The regulations define "evaluation" in this context as "procedures used in accordance with §§ 300.304 through 300.311 to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs." *Id*. § 300.15. Evaluation "procedures" include "assessments," as the District has emphasized. *See* Def. Mem. at 15; Def. Reply at 3–4; *Jones-Herrion*, 2019 WL 5086693, at \*3. Another evaluation "procedure"—explicitly required when a child is re-evaluated—is a "review of existing data on the child." 20 U.S.C. § 1414(c)(1) (requiring data review "as part" of a reevaluation and, if appropriate, an initial evaluation); *see also* 34 C.F.R. § 300.305(a) (same). Yet another evaluation "procedure" is "determination of eligibility and educational need." *See* 20 U.S.C. § 1414(b)(4) (organizing eligibility determination under "evaluation procedures"); *compare also*

34 C.F.R. § 300.306 (section describing eligibility determination) *with id.* § 300.15 (defining "evaluation" as "procedures used in accordance with §§ 300.304 through 300.311"—a range that includes § 300.306). So "assessments," "review of existing data," and "determination of eligibility and educational need" are all "procedures" that can together constitute an "evaluation." Or, to continue the building block analogy, any combination of assessment-, data review-, and eligibility determination- blocks can be stacked to construct an evaluation. However constructed, the goal of the evaluation is to "determine whether [the] child has a disability and the nature and extent of the special education and related services that the child needs." *Id.* § 300.15.

This statutory and regulatory structure is squarely at odds with the District's position. At the November 25 Meeting, the LaSalle members of E.H.'s IEP team reviewed existing educational performance assessments and two diagnostic evaluations of E.H. that concluded he met diagnostic criteria for Autism Spectrum Disorder. AR 359–63. Based on that data, the team decided that "no further testing [was] required" to determine whether E.H. had a disability or the extent of his educational needs. AR 364. These actions match the evaluation procedure described in 34 C.F.R. § 300.305 (review of existing data). Because no additional data was necessary, no assessments were warranted. *See id.* § 300.305(d). The team then moved on to the eligibility determination phase and concluded that E.H. was a child with a disability, but under a different disability classification than had previously been assigned. *See* AR 364. This action matches the evaluation procedure described in 34 C.F.R. § 300.306 (eligibility determination).[7]

---

[7] The determination of eligibility procedure also includes determination of the child's educational needs. *See* 34 C.F.R. § 300.306(a)(1). The LaSalle team must have determined E.H.'s educational needs because they developed a new IEP for E.H. *See* AR 364. The IEP must include goals designed to meet a child's "needs that result from the child's disability" and "other educational needs." 34 C.F.R. § 300.320(a)(2)(i); 20 U.S.C. § 1414(d)(1)(A)(i)(II). Thus,

The review of existing data and eligibility determination procedures together amounted to an "evaluation" that E.H. had multiple disabilities and required special education and related services as described in the IEP.  *Cf.* 34 C.F.R. § 300.15.  The November 25 Meeting was therefore, among other things, an "evaluation" within the meaning of § 300.502(b) that triggered the Parents' right to an IEE.  That the school used no assessment-type building blocks is irrelevant; the LaSalle team constructed E.H.'s evaluation out of data review- and eligibility determination- blocks instead.

There exists limited caselaw to the contrary.  In his Interim Decision, Hearing Officer Vaden pointed to *F.C. v. Montgomery County Public Schools*, an unpublished decision from the District of Maryland that involved a similar meeting at which school officials reviewed existing data about a student and concluded that no new data was needed to determine that the child continued to have a disability and had educational needs warranting special education services.  *See* AR 759–60; *F.C. v. Montgomery Cnty. Pub. Schs.*, No. 14-CV-2562-TDC, 2016 WL 3570604, at *1 (D. Md. June 27, 2016).[8]  The *F.C.* court concluded that this meeting did not constitute an "evaluation" entitling the parents to an IEE because several "required steps for evaluation" never took place.  *Id.* at *3.  Among these "required steps" were use of "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child" and use of "technically sound instruments [to] assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors."  *Id.* (quoting 34 C.F.R. § 300.304(b)).

---

to develop E.H.'s IEP, the team must have determined E.H.'s educational needs, and so must have completed the full eligibility determination procedure contemplated by 34 C.F.R. § 300.306.

[8] The parties do not discuss *F.C.* in their briefs to this Court.

The undersigned is not swayed by the reasoning of *F.C.*, because the decision's analysis is not tethered to the statutory or regulatory law.  *F.C.* draws a distinction between "required" evaluation procedures and apparently optional ones "for specific forms of evaluations, such as determining eligibility[.]"  *Id.* at \*3.  No citation or analysis is provided for that distinction.  *See id.*  The decision cites but does not grapple with the definition of "evaluation" in 34 C.F.R. § 300.15, which includes the eligibility determination procedure described in § 300.306.  *See id.*  Moreover, if an eligibility determination is a "specific form of evaluation[,]" as the *F.C.* court opined, it is not clear why this "specific form of evaluation[]" is nevertheless not an "evaluation" giving rise to procedural protections under 34 C.F.R. § 300.502(b).  Section 300.502(b) does not distinguish between various evaluation "forms."  The undersigned accordingly declines to make a recommendation to this Court based on nonbinding precedent from another district that does not clearly track the statutory or regulatory language of the IDEA.

> ### C.     The District's refusal to fund an IEE was a procedural defect that did not result in a denial of FAPE.

The Parents seem to suggest that the conclusion that the November 25 Meeting was an "evaluation" within the meaning of § 300.502(b) settles the question of their eligibility for an IEE and so the District's liability in this case.  *See* Pl. Mem. at 15; Pl. Reply at 4.  The Parents sent LaSalle representatives and an attorney for DCPS a formal letter indicating that they "disagree[d] with the unilateral re-evaluation conducted by [DCPS] on or about November 25, 2019."  AR 391–92 (the "January 31 Letter"); *see also* Pl. Reply at 4.  The regulations provide for an IEE at public expense if a parent "disagrees" with an "evaluation," unless the school files a due process complaint and demonstrates that its evaluation was appropriate.  34 C.F.R. § 300.502(b)(1)–(2).  There is no question that the District did not file a due process complaint or demonstrate the adequacy of its evaluation here.  And the undersigned agrees with the Parents

that their language in the January 31 Letter indicating that "the comprehensive re-evaluation requested by the parents has not occurred" is beside the point—that the LaSalle team's actions at the November 25 Meeting amounted to an "evaluation" is a legal conclusion, not a purely factual one, and the meeting's classification cannot be conceded through so standard a legal practice as arguing a client's position in the alternative.

Not every procedural failure to comply with the IDEA amounts to a violation of law, however. *See Richardson v. D.C.*, 273 F. Supp. 3d 94, 101 (D.D.C. 2017); *see also T.P. ex rel. T.P. v. Bryan Cnty. Sch. Dist.*, 792 F.3d 1284, 1293 (11th Cir. 2015) (claim that a school denied parents an IEE at public expense is a procedural defect). A procedural defect on the part of a school violates the IDEA only if it affects a student's "substantive rights" by "(i) imped[ing] the child's right to a FAPE; (ii) significantly imped[ing] the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caus[ing] a deprivation of educational benefit." *Richardson*, 273 F. Supp. 3d at 101 (quoting 34 C.F.R. § 300.513(a)(2)); *see also* 20 U.S.C. § 1415(f)(3)(E)(ii). The Parents bear the burden of persuasion on this point by the preponderance of the evidence. *See* D.C. Code § 38-2571.03(6)(A); 34 C.F.R. § 300.516(c)(3); *see also S.B.*, 783 F. Supp. 2d at 50 (burden is on the party challenging the administrative determination).

The Parents did not address the effect, if any, of the IEE denial in their briefs to this Court. *See generally* Pl. Mem.; Pl. Reply. Nor, for that matter, did the District. *See generally* Def. Mem.; Def. Reply. The impact of the IEE denial is not readily apparent to the undersigned. The Parents do not object to E.H.'s disability classification, the determination that he is eligible for special education services, or, ultimately, that the March 2020 Resolution Session amendment to his IEP adequately addresses E.H.'s educational needs. *See generally* Pl. Mem.;

Pl. Reply.  Because the burden of demonstrating that E.H.'s substantive rights were impacted by the IEE denial falls on the Parents, the undersigned recommends that this Court affirm Hearing Officer Vaden's determination that the District's refusal to fund an IEE for E.H. was not a denial of FAPE, notwithstanding the Hearing Officer's error as to the nature of the November 25 evaluation.

## II.    The Compensatory Education Award Claim

The second challenge to Hearing Officer Vaden's administrative decision relates to the compensatory education he awarded for the District's uncontested failure to provide E.H. with a FAPE between November 25, 2019, when LaSalle held the evaluation and IEP meeting without the Parents, and March 2, 2020, when the school modified E.H.'s IEP in light of the Parents' concerns.  *See* Compl. ¶¶ 29–30.  During that eleven-week period, E.H.'s IEP reflected the LaSalle team's assessment that E.H. required fourteen hours of specialized instruction services each week, including six hours outside general education.  AR 5.  At the March 2 Resolution Session, E.H.'s IEP was modified to reflect that E.H. required full-time placement at a nonpublic school.  AR 5–6.  Hearing Officer Vaden determined that the LaSalle IEP team would likely have reached the same conclusion at the November 25 Meeting had the Parents been present to advocate for E.H., and that E.H. was entitled to compensatory education of sixty hours of academic tutoring and eight hours of ABA therapy.  AR 6, 8.

Compensatory education is meant to place a student in the same position the student would have been "absent FAPE denial."  *B.D.*, 817 F.3d at 798.  An award must be individualized and seek "not only to undo the FAPE denial's affirmative harm, but also to compensate for lost progress that the student would have made."  *Id*.  This Court owes the administrative determination of a compensatory award "little deference" and may substitute its own award based on evidence in the record.  *Reid*, 401 F.3d at 525, 526.  If record evidence is

inadequate to craft an appropriate award, the Court may also solicit additional evidence from the parties or remand the matter for further administrative proceedings.  *See id.* at 526.

The Parents raise two concerns with Hearing Officer Vaden's compensatory education award in this case.  First, they suggest the award is based on a "mathematical formula" that expressly contravenes the D.C. Circuit's holding in *Reid*.  *See* Pl. Mem. at 18; Pl. Reply at 5. *Reid* rejected "cookie-cutter" approaches to calculating compensatory education awards in favor of individualized, qualitative assessments of the education necessary to place each individual student in the place the student would have been absent the denial of FAPE.  *Reid*, 401 F.3d at 523–24.  Second, the Parents suggest that Hearing Officer Vaden improperly placed the burden on them to present evidence supporting what they believed would be an appropriate compensatory education award, and that, if this improper burden is removed, no evidence remains to support the compensatory education awarded.  *See* Pl. Mem. at 18–19; Pl. Reply at 6– 7.  The District counters that the compensatory education awarded by the Hearing Officer did not violate *Reid* and that, in any event, the Parents waived their right to seek additional compensatory education by failing to submit a compensatory education proposal.  *See* Def. Mem. at 15–19; Def. Reply at 5–6.

> ### A.     *The Parents did not waive their right to challenge the Hearing Officer's compensatory education award.*

Because the District's waiver theory would moot the parties' substantive compensatory education arguments, the undersigned addresses that issue first.  The District insists that the Parents had the opportunity to present a compensatory education plan and "chose not to provide one," thus waiving their opportunity to challenge the adequacy of the Hearing Officer's award in this Court.  *See* Def. Mem. at 18–19.  In support, the District cites a report and recommendation issued in *Wade v. District of Columbia*, No. 20-cv-1433-JEB-GMH, 2021 U.S. Dist. LEXIS

156619 (D.D.C. Feb. 19, 2021).[9]  *See* Def. Mem. at 18; Def. Reply at 5.  That case makes clear

that a plaintiff can waive the right to compensatory education by failing to present evidence of a

proper compensatory education plan.  *See Wade*, 2021 U.S. Dist. LEXIS 156619, at *41–45; *see*

*also Jones v. District of Columbia*, No. 15-cv-1505-BAH-GMH, 2017 WL 10651264, at *9

(D.D.C. Jan. 31, 2017), *report and recommendation adopted*, 2017 WL 10651306 (D.D.C. Feb.

22, 2017) (holding same).

> The undersigned does not believe *Wade* and *Jones* apply neatly to this case.  This Court

determined that the plaintiff in *Wade* waived her arguments regarding compensatory education

due to her "complete failure to present evidence of a plan for compensatory education," as well

as her repeated statements during administrative proceedings that the sole remedy she sought

was a new IEP meeting.  2021 U.S. Dist. LEXIS 156619, at *41–44; *see also id.* at *19–20

(noting the plaintiff "did not propose a compensatory education remedy").  These facts "taken

together" demonstrated that the plaintiff "made the strategic decision not to present evidence that

a compensatory education plan would remedy any purported educational harm derived from the

denial of a FAPE."  *Id.* at *44.  Similarly, in *Jones*, waiver was appropriate because the plaintiff

withdrew her request for compensatory education prior to the administrative hearing, purportedly

to "reserve it as relief to be raised in the future."  2017 WL 10651264, at *8.  The plaintiff

apparently sought a final determination regarding the denial of FAPE before litigating the

compensatory education award, and on appeal asked this Court only to remand her case so that

an appropriate compensatory award could be calculated once the FAPE denial was confirmed.

*Id.*  This Court held that a plaintiff cannot "unilaterally bifurcate" her IDEA case into liability

---

[9] The report and recommendation issued in *Wade* was adopted by this Court just as the
parties finished their briefing in this case.  *See Wade v. District of Columbia*, No. 20-cv-1433-
JEB-GMH, 2020 WL 3663630, 2021 U.S. Dist. LEXIS 155365 (D.D.C. Aug. 18, 2021).

and compensation phases, as doing so "rob[s] the Hearing Officer [and the Court] of the opportunity to resolve the matter as expeditiously as possible" and would lead to "further inefficiencies in the adjudication of IDEA cases" moving forward. *Id.* at *9. Both *Wade* and *Jones* thus turn on the fact that the plaintiffs in those cases decided not to seek compensatory education relief during the administrative proceedings that were later challenged in this Court.

That fact is not present here. The Parents here never abandoned their argument that they were entitled to compensatory education, as in *Wade*, nor did they attempt to "reserve" the issue of compensatory education for a later date, as in *Jones*. Instead, during the administrative proceedings below, they submitted an affidavit by Dr. Paul Livelli, an expert qualified in the development of compensatory education plans, *see* AR 1049, stating that in his opinion it was "not possible to develop an appropriate compensatory education plan" for E.H. without additional information about E.H.'s educational achievements and progress. AR 840–41. The Parents accordingly insisted, both here and in the administrative proceedings below, that new assessments of E.H. were required to develop an appropriate compensatory education plan. *See* AR 796–99; Pl. Mem. at 19–20. They have repeatedly requested relief in the form of assessments to inform a compensatory education plan, *plus* the compensatory education calculated once those assessments are performed. *See* AR 799; Pl. Mem. at 21. This relief is theoretically available to the parents. *See Friendship Edison Pub. Charter Sch. Collegiate Campus v. Nesbitt*, 583 F. Supp. 2d 169, 172 (D.D.C. 2008) (ordering additional assessments of a child to craft an appropriate compensatory education award); *cf. also Reid*, 401 F.3d at 243–44 (finding that plaintiff had not waived claim to compensatory education award by advancing a disfavored alternative theory for how the award should have been calculated). Accordingly, because the Parents have insisted throughout this case and in the administrative proceedings

below that they seek relief in the form of assessments to inform and ultimately aid in the

calculation of an appropriate compensatory education award, they have not waived their right to

pursue that relief in this Court.

**B.** ***The Hearing Officer's compensatory education award is not individually tailored to put E.H. in the place he would have been absent the denial of FAPE.***

The undersigned now turns to the adequacy of the compensatory education awarded by

Hearing Officer Vaden.  To survive this Court's scrutiny, an award must be based on a "'fact-

specific' inquiry" into the "'educational benefits that likely would have accrued [to the student]

from special education services the school district should have supplied in the first place.'"

*Phillips ex rel. T.P. v. District of Columbia*, 736 F. Supp. 2d 240, 248 (D.D.C. 2010) (quoting

*Reid*, 401 F.3d at 524).  The Hearing Officer's analysis must be "qualitative rather than

quantitative," focused on the student's individual needs and typical educational progress.  *Mary*

*McLeod Bethune Day Acad. Pub. Charter Sch. v. Bland*, 555 F. Supp. 2d 130, 135 (D.D.C.

2008).  For that reason, this Court has rejected "cookie-cutter or mechanical" formulas for

calculating an appropriate award.  *Id.* (quoting *Reid*, 401 F.3d at 523–24).  A "paucity" of

evidence will also indicate that an award is not appropriately tailored to the child's individual

needs.  *Branham v. Gov't of the District of Columbia*, 427 F.3d 7, 11 (D.C. Cir. 2005).

The Parents insist in their briefs to this Court that Hearing Officer Vaden's compensatory

education award contravenes *Reid*'s cookie-cutter rule because the award was calculated using a

"rote mathematical formula."  Pl. Mem. at 18.  The "formula" allegedly counted the "hours [a

school psychiatrist] thought the student had missed and multiplied by 3,"[10] because the

---

[10] The undersigned suspects the Parents' argument is that the school psychiatrist multiplied 3 estimated hours of instruction per day by the number of *days* the psychiatrist estimated E.H. missed, not *hours*, so that the calculation is 3 hours of daily instruction times 20 missed days for a total award of 60 hours of specialized instruction.  This is the equation suggested by the District's compensatory education plan.  *See* AR 847.

psychiatrist assumed E.H. would have received 3 hours of services per day during a period akin to the 12-week summer break observed by most schools.  *Id.*  This "hour-for-hour" award, the Parents say, violates *Reid* and must be vacated.  Pl. Reply at 5.

Hearing Officer Vaden considered and dismissed this argument in the administrative proceedings below because compensatory awards "constructed with the aid of formula [are] not *per se* invalid" and because "formula-based award[s] may in some circumstances be acceptable" if the award nevertheless represents "an individually-tailored approach to meet the student's unique prospective needs."  AR 10–11 (quoting *Mary McLeod*, 555 F. Supp. 2d at 136, and *Friendship Edison*, 532 F. Supp. 2d at 123).  The District adds that the compensatory education award here is not an hour-for-hour calculation in any event, because such a formula would have resulted in an award of 165 hours of compensatory education, calculated as 55 missed school days times 3 hours per day of missed services.  *See* Def. Mem. at 17.

Hearing Officer Vaden is correct that there is no *per se* rule against the use of mathematical formulas in this Court.  *See Mary McLeod*, 555 F. Supp. 2d at 136; *Friendship Edison*, 532 F. Supp. 2d at 123.  If the Parents' objection to the award was based purely on the fact that it was calculated with the aid of an equation, the objection would be without merit.

But this is not the Parents' sole objection to the award, even if it is the argument they advance most ardently.  The Parents also insist that the compensatory education award was not based on "the impact the missed services had on [E.H.]'s ability to make adequate progress [and] access the general education curriculum, and the educational benefits that would have accrued from the special education services that the school failed to provide."  Pl. Mem. at 15.  They say Hearing Officer Vaden failed to perform the "qualitative" and "fact-intensive" analysis required by *Reid*, *id.* at 16, and that there is "*no* evidence in the record" that could possibly support a

different conclusion.  Pl. Reply at 5 (emphasis original).  A similar argument was advanced during the administrative proceedings: Hearing Officer Vaden's decision notes that the Parents objected to the District's compensatory education plan because it was "not based on underlying data specific to" E.H.  AR 9.  The District counters that its plan incorporates data from E.H.'s IEP, progress reports, grades, cumulative educational record, psychoeducational report, and interviews with E.H.'s case manager, teacher, and principal.  *See* Def. Mem. at 16.

A close review of the District's proposal shows that the Parents are correct.  Although the compensatory education plan was developed after an expert reviewed E.H.'s individual files, the proposal was not meant to place E.H. in the position he would have been absent the FAPE denial.   The proposal was developed by school psychologist Dr. Shantrell Huffman, who testified that the compensatory education plan was based on records in E.H.'s file, including formal educational assessments performed in 2017 and informal tests from September 2019, as well as conversations with E.H.'s teachers, principal, and case manager.  AR 1321–1324, 1344. That data convinced Dr. Huffman that E.H. has "average cognitive ability" and suggested E.H. was "developing average, the way that we would expect him to."  AR 1336:11–17.  From this premise Dr. Huffman made an "educated guess" about E.H.'s current academic performance. AR 1337; *see also* AR 1339 (clarifying that no "actual data" existed on "where [E.H. was] achieving in August of 2020").  He noted that students' cognitive abilities do not shift in the absence of a traumatic brain injury, inferring that because E.H. has not suffered such an injury his cognitive abilities remained stable over time.  *See* AR 1337, 1345–46.

Dr. Huffman next paired this information specific to E.H. with statistical data about average student learning loss over the typical summer break from school.  AR 1327–28, 1331– 34, 1341.  Although data was mixed, Dr. Huffman interpreted the literature to indicate that

students like E.H. lose, on average, the equivalent of one month's learning over a 12-week summer break.  AR 1342:1–2, 1347, 847.  He then considered that students receive one hour of instruction per school day in math, reading, and writing, for a total of three hours of academic instruction.  AR 1342:12–17.  Multiplying those three hours per day by the twenty school days per month "lost" over a typical summer break, Dr. Huffman arrived at the conclusion that E.H. required sixty hours of compensatory education.  AR 1342:18–20, 847.  He proposed eight hours of ABA therapy using a similar model: Because E.H. "probably would have been given" two hours of ABA service per week, Dr. Huffman multiplied this number by four to account for the month of lost learning over a typical summer.  AR 1343, 847.

Dr. Huffman's testimony reveals why the District's compensatory education proposal was inadequate, and why Hearing Officer Vaden erred in adopting it wholesale.  Even assuming *arguendo* that E.H. has "average" cognitive abilities and experiences summer learning losses akin to other "average" students, compensatory education is not "a form of damages" in which schools are required to make up for "expenditures they should have made previously."  *Reid*, 401 F.3d at 523.  "To fully compensate a student, the award must seek not only to undo the FAPE denial's affirmative harm, but also to compensate for lost progress that the student would have made."  *B.D.*, 817 F.3d at 798.  Dr. Huffman's proposal is aimed only at undoing affirmative harm—that is, remediating a summer's worth of learning loss—not at replacing the learning *progress* that E.H. would have achieved over the same period.

This error is enough to demonstrate that the compensatory education awarded below should be reversed by this Court.  *See Reid*, 401 F.3d at 525 (noting that the party challenging an administrative determination may "persuade the court that the hearing officer was wrong . . . simply by pointing to the award's evident arbitrariness").  The undersigned accordingly

recommends that this matter be remanded for further proceedings before Hearing Officer Vaden, with the instruction that a new compensatory education award crafted for E.H. must be based on data specific to E.H.; calculated to put E.H. in the position he would have been "absent FAPE denial," including any learning progress that E.H. can reasonably have been expected to make during the 11-week period he was denied a FAPE; and explicitly describe how the compensatory education plan is linked to the March 2020 IEP that ended the FAPE denial at issue.  The undersigned further recommends that the instructions on remand include the D.C. Circuit's guidance from *B.D.* that, "[i]n carrying out the complicated work of fashioning" an appropriate remedy, hearing officers must pay "close attention the question of assessment," utilizing any assessments that have been performed for E.H. while this case remained pending to fashion an appropriate compensatory education plan.  817 F.3d at 799–800.

## RECOMMENDATION

For the preceding reasons, the undersigned recommends that this Court DENY-IN-PART the Parents' Motion for Summary Judgment, ECF No. 15, insofar as that motion seeks reversal of the Hearing Officer's determination that the Parents were not entitled to an IEE at public expense as a result of the Parents' disagreement with the evaluation conducted at the meeting held on November 25, 2020; and GRANT-IN-PART the District's Cross-Motion for Summary Judgment, ECF No. 16, seeking affirmation on that same point.  The undersigned further recommends that this Court GRANT-IN-PART the Parents' Motion for Summary Judgment, ECF No. 15, insofar as that motion seeks reversal of the Hearing Officer's compensatory education award of sixty hours of specialized instruction and eight hours of ABA therapy for the for the 11-week denial of FAPE; DENY-IN-PART the District's Cross-Motion for Summary

Judgment, ECF No. 16, insofar as it seeks affirmation of that award; and REMAND that issue for further administrative proceedings.

## REVIEW BY THE DISTRICT COURT

The parties are advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to a Report and Recommendation must file a written objection with the Clerk of this Court within fourteen days of the party's receipt of the Report and Recommendation.  The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objection.  The parties are further advised the failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

Signed on February 15, 2022.

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE